I'm going to attempt to pronounce your name. Mr. Hergonis? All right, step right up. Take it away. Good afternoon, your honors, and may it please the court. The 2017 payday lending rule is invalid for several reasons, but the simplest and most straightforward way to decide this case is to apply the remedial framework set forth in the Supreme Court's Collins opinion. We're entitled to relief under that framework because it is undisputed that the unconstitutional removal restriction actually blocked President Trump from effectuating his desire to remove Director Cordray from office before Cordray promulgated the rule. Under Collins, this is the precise scenario that causes harm and requires a remedy. Moreover, the subsequent director's wave-of-the-pen ratification did not cure this harm. Whatever the merits of ratification in other contexts, a legislative rule requires notice and comment rulemaking undertaken by a director properly exercising executive authority. That never happened here. And this case vividly illustrates why notice and comment rulemaking is necessary because the Bureau's ratification by memo failed to reckon with changed circumstances that eliminated the court justifications for the rule. You know that, sorry to interrupt so early, but you kind of take issue with whether Justice Kagan correctly summarized the majority's holding on the remedy in Collins, sorry, Collins. So you kind of take issue with the notion that her concurrence correctly stated it. And, but nobody in the majority, or the majority, seemed to disagree with her description or summary of the holding. So do we glean anything from that or nothing to see there? I don't think we can, Your Honor. I mean, I think Justice Kagan's concurring opinion may have been a little bit vague, but there's no responsibility or no obligation for the majority to respond point by point to a concurring opinion. I think the majority opinion in Collins makes crystal clear when there is harm that requires a remedy. And the court says that harm exists where the removal provision in fact prevented the president from removing the director, where it had a concrete effect. And the removal provision did its job here. Common Sense, the contemporaneous reporting, and Cordray's own after-the-fact account of what happened all combined to show that when President Trump was elected, he came into office wanting to replace the director, wanting to replace the directors, he replaced all executive officers with a person of his own choosing. Director Cordray refused to resign and even went so far as to prepare litigation to contest a removal. President Trump was advised not to fire Director Cordray pending resolution of the constitutionality of the removal restriction in the courts of appeals, and it was particularly the PHH case, which had just been taken en banc weeks after President Trump took office. I take it you believe that you do not need to show that the Bureau would have acted differently but for the removal restriction, correct? Correct. We don't need to show that. That's the Bureau's counterfactual test that they attempt to engraft, relying, as Your Honor noted, on Justice Kagan's concurring opinion. Now, supposing for the sake of argument that we disagree, this plain devil's advocate, is there any evidence that CFPB would not have promulgated the rule but for that removal restriction? We think in that case, the district court below granted summary judgment to the parties who should be entitled to discovery on that question, which we asked for in the district court and didn't get, but it's entirely speculative. No current record evidence, but your hope and expectation is there would be if you were able to go forward? Well, again, we don't think that's the right inquiry, but if we had to go forward, the parties would be entitled to discovery. We would be entitled to discovery on that, but it's entirely speculative. On the Bureau's part, they point to the ratification that occurred three years later by a different director, but it's unlikely that Director Kraninger, who ratified the rule in 2020, would have been Trump's initial appointee to the Bureau in 2017, and we just can't. And that's one of the reasons why looking at this speculative counterfactual analysis isn't the right inquiry. It's just an unknowable question. And no separation of powers case has ever looked at counterfactual. Lucia, for example, didn't ask how a properly appointed ALJ would have decided the case. It required a new hearing, in fact, in that case by a new ALJ. So the counterfactual inquiry is inconsistent with separation of powers, and it's easy to see why the Collins test is the correct test from a separation of powers perspective, because once it is shown that the officer would have been removed, which the Bureau doesn't dispute here, the officer is situated exactly like the improperly appointed officer. He is improperly occupying the office, and therefore he is exercising the president's executive power. So just like the improper appointee, there is to quote you, Judge Willett, from your Collins remedial opinion in the earlier iteration of Collins, there is at that point a defect in authority. Or to borrow language from Judge Jones's opinion last week in All-American, Cordray at that point lacked authority to wield executive power. So it follows from that that plaintiffs here are entitled to a remedy, and we think the remedy should be setting aside the rule. Now the Bureau falls back on ratification as a remedy, and the parties dispute whether it's appropriate to view this through the lens of ratification where you have a separation of powers violation like this. But fundamentally, where there is a defect in authority as occurred here, the Supreme Court's cases require essentially a do-over. And I point again to Lucia, where you had a defect in authority, an improperly appointed ALJ, and the court said the agency action needed to be redone by an officer properly exercising the authority, properly appointed. And the do-over in this context is a new notice and comment rulemaking, because we're dealing here with a legislative rule that imposes obligations on private parties, just like the do-over in Lucia was a new hearing. And this fact distinguishes virtually all of the Bureau's out-of-circuit ratification cases, because those cases tend to involve situations where the party is challenging an enforcement decision or a prosecutorial decision or a civil investigative demand by an agency head. So the agent, the properly, the proper agency head then comes along and ratifies the decision by signing a memo saying I would have brought this enforcement action or issued this CID. Well, you can call that a ratification if you'd like, but the fundamental point is that the party there is getting the same process to which he was originally entitled, a director sign-off unilaterally authorizing the agency to take some conduct. Notice and comment rulemaking is different. It has required procedures that the Bureau and the director need to go through, most prominently soliciting comments from the interested public and engaging with and responding to those comments. And here, we never had a properly led Bureau by a properly, by an officer properly exercising executive power do that. Instead, we had Director Kraninger come in three years later and rubber stamp the original defective notice and comment rulemaking. And we think that the need for notice and comment is vividly demonstrated here by the Bureau's failure to consider changed circumstances when it ratified the original rulemaking. And this failure both illustrates why notice and comment is essential, an essential part of the remedy, and also provides an independent basis for invalidating the ratification as arbitrary and capricious. And I'll tell you what the changed circumstances are. Recall there were two parts to the 2017, the original 2017 rule. There were the payment provisions that are at issue in this case, and there were underwriting provisions that required lenders to check the ability of consumers to repay their loans. At the same time that the Bureau ratified the payments provisions, it repealed the underwriting provisions. But this repeal cut out the legs from under the payments provisions in two key ways. First, it undercut the Bureau's required cost-benefit analysis. The statute requires the Bureau to undertake a cost-benefit analysis. In 2017, when considering the costs and the benefits of the payment provisions, the Bureau looked to the underwriting provisions and said that those provisions would lessen the impact, quote-unquote, lessen the impact of the payments provisions. And they did so because they were eliminating, in the Bureau's estimation, the 90 percent of loans that were least likely to be repaid by the consumers and most likely to trigger the insufficient fund fees that the payment provisions are concerned about. The Bureau, in fact, said at the time that the underwriting provisions would make unsuccessful payment attempts less frequent. Well, this rationale vanished once the underwriting provisions were repealed. But in this one-page memo ratifying the payment provisions, the Bureau didn't reassess and didn't even acknowledge that the core cost-benefit justification from 2017 had simply been eliminated. And that's textbook arbitrary and capricious action. And the Bureau has no answer to this. And the Bureau, in a second way, undercut the premises of the payments provisions by repealing the underwriting provisions. What it did is it repealed the underwriting provisions based on a reinterpretation of the unfair and abusive provisions of the statute. The statute requires the Bureau to find a practice unfair or abusive in order to prohibit it. And it's a multifactored standard that has a lot of prongs, but the two core prongs that are at issue here are that to be unfair and abusive, the conduct can't be reasonably avoidable by the consumer, and the consumer has to have a lack of understanding about the risks. And in 2017, the Bureau said that you cannot avoid, you cannot reasonably avoid the harm simply by declining the product, and also that the consumer must specifically appreciate the individualized circumstances and the underwriting provisions. It threw that definition overboard and replaced it with a different definition where a consumer can avoid harms by declining to buy the product in the first place, and that a consumer need only understand the general risks, not the specific risks. And the Bureau, in its one-page ratification memo, never considered whether the new standard justified the payment provisions. In fact, it didn't even acknowledge that it had changed the standard when it rubber-stamped the earlier notice and comment rulemaking. So the Bureau tries to cherry-pick language from the original 27 rulemaking, which is a 450-page document in the Federal Register, and say that these few isolated statements suggest that the rule could be justified under the new standard. But our two responses to that are, first, that the agency needs a contemporaneous explanation, not a post-hack rationalization in its lawyers' briefs, and it didn't provide that contemporaneous explanation at the time of the ratification. And second and more fundamentally, it changed the standard and was required to apply the new standard, not to pick out some stray statements in the context of applying the older, incorrect standard, now rejected standard, and try to say that those statements somehow justify the rule under the new standard. Let me pull you over to the Appropriations Clause. Has any court held that the Congress to impose temporal limitations on appropriations? No. And, you know, I think that's a—we're working on a clean slate on that argument, and I would really defer to Judge Jones' concurring opinion last week in All-American check cashing. I know you, Judge Willett, and you, Judge Wilson, didn't join that opinion. I believe Judge Englehart did. If the Court doesn't decide the Collins ratification issues in our favor, then it would need to address the Appropriations Clause argument. And as I said, that's a clean slate. But we would urge it to decide the case on the more simpler grounds, either Collins and ratification, or alternatively— Suppose we're gluttons for punishment, and we kind of leapfrog, and we go there. And suppose we agree with you that all appropriations have to be handled through annual, old-fashioned spending bills. Explain how that would or would not imperil agencies like the Federal Reserve, or the FDIC, or the effect on mandatory spending, which is like 70 percent of the federal budget, like Social Security and all the other entitlement programs. Right, right. I think the Court would need to reach those agencies. Those agencies operate very differently. The Federal Reserve isn't—doesn't regulate the general public. I think this played a key part in Judge Jones's opinion, as well, with the breadth that this agency does, where it imposes rules on members of the public. The Federal Reserve raises its money from fees on regulated entities, whereas this agency draws its money not on fees from regulated—from entities that it's regulating, but by pulling monies out of the Federal Reserve's budget. So we think there are differences that would justify not necessarily extending it to those agencies. Of course, that would be a question for another case. But we don't think a ruling violating this funding mechanism under the Appropriations Clause— I think my question is just, are those differences that you cite, are they historically rooted? Are they precedential? Are they kind of mandated by any sort of understanding of the Appropriations Clause when it was enacted? I mean, are they just kind of ad hoc, we know it when we see it, distinctions, or—? There's a little bit of that here, but this is greater—this is greater intrusion than those other agencies, and again, I point to the fact that this agency regulates the general public. What's the remedy if we were to go to the Appropriations Clause? I think the remedy is to invalidate the 2017 rule, which is the remedy we're seeking here, because that rule was funded—the entire rulemaking was done with improperly appropriated funds. So we'd embark on a different analysis than the Supreme Court did in terms of severability? I think so. We don't have a challenge to—we don't have a challenge there to the provision of the statute in terms of severability. We think the rulemaking is invalid because the rulemaking would have been conducted pursuant to the improper appropriations. Whether that clause should be severed or the Bureau should be invalidated would not be a question that the Court would need to address in this case. I see that my time has expired, so I'll save the remainder of my argument for my rebuttal. All right. We appreciate it. Thank you. Okay. We'll hear from the CFPB. Thank you, Your Honor. Mr. Friedel, Kevin Friedel for the Consumer Financial Protection Bureau. May it please the Court, the plaintiffs who brought this suit seek to invalidate an consumer protection based largely on a statutory provision that it is now clear had no legal effect and never harmed them in any way. I understand them to now essentially concede that the Collins framework governs this issue. That concession is sound. The Supreme Court in Collins set out a broad rule applicable to removal provision claims like this that was recognized by the concurrence in All-American. And under Collins, plaintiffs are not entitled to relief. The first thing that Collins makes clear is that the Bureau and the Director at all times had the authority to carry out their statutory functions, including the authority to issue regulations as they did here, and that when the Bureau did that, those actions were not void. They were valid. The Bureau satisfied the APA's notice and comment requirements when it issued this rule through notice and have offered really no coherent theory of harm in this case. I understand the argument now to be that because, they say, President Trump wished to but did not actually seek to remove Director Cordray, that that mere wish never acted upon, deprived Director Cordray and or the Bureau of the authority granted it by Congress. That's squarely contrary to Collins, where the Court said a removal provision did not deprive any of the heads of the FHFA, including those that the President may have wanted to remove, of the power to undertake the responsibilities of his office. To the extent that, so that mere wish never deprived the Bureau of authority did not render this action void at the time it happened. To the extent, they're not really arguing about authority, they're just saying, well, we were harmed because President Trump would have wanted to put someone else in office. We know that they haven't been harmed because when President Trump's own appointees came into office, headed the Bureau, they repeatedly and expressly approved the payments provisions. It's worth going over the history here very briefly. President Trump's first choice to lead the Bureau, Acting Director Mick Mulvaney, said when he arrived that we're going to reconsider the payday rule. The Bureau did that and Acting Director Mulvaney began a process to repeal the underwriting provisions, which clearly were not consistent with the Trump administration's priorities, but to leave in place these payments provisions. What of counsel's argument, though, that in doing that, without going through new notice and comment rulemaking, the repeal of the underwriting rule undermined the rationale or the basis for implementing the payday rule? Thank you, Your Honor. So I want to address that, but first I think that under Collins it's clear that ratification as a sort of formal ratification wasn't even necessary here. That was Judge Bevis' conclusion in the National Collegiate case. And so they are making these arguments about supposed inconsistencies in service of their attack on the ratification. The validity of the ratification only matters in this case, I think, to the extent it bears on the validity of the payments provisions. And we think because this ratification wasn't even strictly necessary, the Court doesn't have to go down this road. But to address your question, Judge Wilson, there was no inconsistency here. So the Bureau said, I think the explanation is somewhat different for the lack of understanding element versus the inability to protect and not reasonably avoidable analysis. So for lack of understanding, what the Bureau said when it issued the underwriting provisions was that consumers understand basically the harms that can befall one from getting into an unaffordable loan, this cycle of reborrowing that can happen. They just don't think that will happen to them. They understand the general risk. They don't think it will personally befall them. That's very different from what the Bureau said with respect to the underwriting — excuse me, the payments provisions, where it said consumers don't understand this practice at all. It's not apparent on the face of the payment authorizations in the contract. The things lenders do in this market differ markedly from what goes on in other markets. And by the time, you know, the harms begin to befall a consumer, there are all these tactics that are difficult for consumers to revoke these various forms of account access and protect themselves after the fact. So when in 2020, the Bureau said, look, we don't think it's enough just to say you understood the general danger. You didn't think it would happen to you. That was a finding that was specific to the underwriting provisions. It had nothing to do with the analysis supporting the payments provisions — excuse me — for the not reasonably avoidable and the inability to protect tests. The Bureau thought in the underwriting context in 2020 that consumers can protect themselves, protect their interests and avoid the harms from getting into an unaffordable loan by choosing different credit products or not It's theoretically possible to not use a product or to try to find a different product. That would mean you could never — that consumers would always be able to protect their interests, avoid harm. In fact, the Bureau specifically said that wasn't true. This is in the 2020 rule at 85 Federal Register 44397. It's only true where the particular threat to a consumer's interest or, you know, the injury coming down the pike is apparent from the beginning, and that just wasn't the case for the payments provisions. And I emphasize it's actually common ground between the parties, I think, that for an injury to be avoidable ahead of time, it has to be — there have to be steps that a consumer can reasonably take, and they have to understand the need to take those steps. So this is on page 44 of a plaintiff's brief. And when it comes to the particular payments practices that were prohibited in the payments provisions, the injuries there are not something that consumers reasonably foresee ahead of time. I mean, these sorts of payment authorizations, to be clear, are common throughout the economy. You might pay your cell phone or your utility bill this way, but if your, you know, gas company engaged in the tactics that these are not something that consumers reasonably foresee ahead of time, you know, you might reasonably say, you know, that's not what I signed up for, that's not what I thought I was getting, and you'd be exactly right. That's why this — that's really a core part of the Bureau's unfairness and abusiveness analysis, and none of that was changed in 2020. So your position is that basically even with the repeal of the underwriting rule, the rationale that underlied — underlay the underwriting rule or both, what's left over with the payday rule was sufficient to clear the arbitrary and capricious bar, et cetera. In other words, it didn't undermine the integrity of the rulemaking initially. That's exactly right, Your Honor. When the Bureau issued the underwriting and payments provisions in 2017, it specifically said that they were independent interventions, they were based on separate findings of unfairness and abusiveness, and each was meant to function alone. If I could also address the point about the cost-benefit analysis, the Bureau did say at one point in this lengthy preamble, look, we think that if the underwriting provisions go into effect, that's going to lessen to some extent the need for the payments provisions, because you're going to have borrowers be put into loans they can better afford, there will be fewer failed withdrawal attempts, so less sort of harm from this repeat withdrawal that these lenders do. But that observation, which the plaintiffs seemed to agree it was correct, played no role when the Bureau actually assessed, okay, what are going to be the benefits and costs of the underwriting provisions. It did that analysis separate from the underwriting provisions, and when it did that analysis, it did not assume that the underwriting provisions would be in effect, and you can see that, for example, on page 54, 847, so this is the very next page after the language they cite, the Bureau was looking at things like, okay, what are the current rates at which these payment requests fail when they're done repeatedly? In the current state of the world with no underwriting provisions, it wasn't looking at, you know, what would be the — what would those rates be where these loans are underwritten. So it was, as we said, expressly the baseline for the comparison was the current state of the world without the underwriting provisions, and the plaintiffs are simply incorrect when they claim that this observation, this general observation about how the two parts might interact played a foundational role or any role at all in the actual assessment of the impact of the payments provisions. I wanted to turn back to the removal provision issue, if I could, briefly, to the extent the plaintiffs are arguing not that President Trump's purported desire to fire Richard Cordray, you know, deprived him of authority, if they're just saying, well, he had authority but we were still harmed here, I would say that sort of account of harm would defy common sense and ordinary remedial principles, because what it would mean is, even in a scenario where the administration expressly approved of some policy that a plaintiff could come in, claim harm from a removal provision, and have that action invalidated, that would actually put them in a better position than they would otherwise have been in were it not for the constitutional problem. It would also mean that — it would have the effect of actually diminishing presidential authority by invalidating an action that the president approved of and wanted his administration to approve. And, again, we have that here not only because Mick Mulvaney began this process to repeal part of the rule but not the other part. When President Trump's next choice to lead the Bureau, Director Kraninger came into office. She completed that rulemaking after the Supreme Court made clear in SALA law that she was removable at will. That rulemaking, again, not only left in place the payments provisions, it left them completely unaltered. Director Kraninger then denied a petition for rulemaking, basically to amend the payments provisions. She looked at that, submitted by one of plaintiff's members, and denied it. Counsel, what is the remedy, then, for the violation? The removal provision? Yes. I think what — what plaintiffs have received because of the SALA law decision is assurance that, you know, this rule was consistent with the will of the executive. Any future action to enforce these provisions — and, again, the rule's not in effect yet — but when it eventually takes effect, any action to enforce it will be — will only be undertaken by an official who's directly answerable to the person that Supreme Court said in SALA law is the most democratic and politically accountable official in government. To the extent they want something — and that's a significant remedy right there, Your Honor — to the extent that they are seeking any further relief, what Collins requires is that they have to show some sort of harm from the removal provision. Is that where the ratification comes in? I mean, is it evidentiary as opposed to ratification in a legal sense? That's exactly right, Your Honor. We think that under Collins, the right way to look at ratification now is as simply additional evidence that this policy was consistent with the, you know, policy objectives of the Trump administration. Part of the calculus in showing harm. That's right. It's further evidence that there was no harm in the first place, we think. If the court did find some sort of harm here, then we would argue in the alternative. In that case, it should look at this ratification as a — as a sort of formal ratification that would, in that circumstance, fully remediate any injury due to the removal provision. All right. What about the Appropriations Clause? Tell me how Judge Jones's opinion is wrong. Well, Your Honor, if I could — List all the ways. Your Honor, so the first point I would make is that we think there is a test the Supreme Court has set out in its holdings in OPM v. Richmond and in Cincinnati Soap. It said in both of those cases that the express command of the Appropriations Clause simply requires that money spent from the Treasury be authorized by statute, by appropriations. And we have that here, and there's no real dispute that we have that here, because Congress did appropriate money for the Bureau's operations when it passed the Consumer Financial Protection Act. Well, set aside the startup appropriations. What about this ad infinitum, we'll see you later? Right. How's that constitutional? So I acknowledge that Judge Jones had — I think a central premise of the concurrence is that there is some sort of unspecified time limit on how long appropriations can go for. So as the time limit issue, what about what I would say is the double-blind appropriations? The CFPB gets its money from the Federal Reserve, which in turn gets its money from fees. So it's double-divorced from the appropriations powers of Congress. Where does that exist anywhere else? So, Your Honor, I would respectfully suggest there is no two-layer problem here. The Bureau is part of the Federal Reserve System. It draws its funds from the combined earnings of the Federal Reserve System. I think that is really indistinguishable from the Federal Reserve Board itself, which is also part of the Federal Reserve System, draws its earnings from the exact same source. You know, it's true that the — under the statute, the Federal Reserve Board plays this role of transferring the money to the Bureau, but — The Bureau says what it wants, and that's what the Bureau gets. Well, Congress has said what the Bureau can draw up to — excuse me, has appropriated money for the Bureau each year. The Bureau doesn't have to spend all of that money. Congress didn't do it each year. The Congress said you get up to 12 percent of the Federal Reserve's budget, and you decide how much it is. We'll see you later. In fact, it's written in the statute, you can't even be called before the committees as far as accountability in Congress. So there are a few points in response to that, Your Honor. First, Congress maintains all of its normal oversight ability with respect to the Bureau. If it wants to hold a hearing on the Bureau's use of funds tomorrow, nothing would prevent it from doing that. There are numerous, in addition to that, you know, ordinary — I think nothing likewise permits — prevents the director of the CFPB or other officials from coming into Congress saying, I don't have to talk to you. I think that's happened, has it not? I mean, I'm paraphrasing, but hasn't that happened? I believe you're referring to Acting Director Mick Mulvaney. He did answer the, you know, questions posed to him. So what I was going to say, Your Honor, is that there are numerous parts of the statute, and this is 12 U.S.C. 5496 and 97, that require the Bureau to report to Congress on its use of funds. It's actually required to report to the Appropriations Committees, that's in 5497E4. So the idea that they can't even look at the Bureau, I think, is contradicted by the statute itself. It reports to its committees of jurisdiction, it submits, you know, annual audits. I'd refer, Your Honor, to the statute, but there are numerous provisions in there giving — ensuring that Congress has oversight into the Bureau's use of funds. Well, is it the — in the Bureau's view, does the Appropriations Clause place any limits on how Congress can structure appropriations? Any at all? I think it probably could not do so in a way that, you know, violates another constitutional provision, for example. But, you know, I'm not sure we actually have an official position on that, other than we don't think there was any violation here, because the sort of appropriation in the Bureau's statute is something Congress has been doing since the very beginning of the country. It complies with the express terms of the Appropriations Clause. And of course, the framers, you know, saw fit to put a temporal limitation on one specific type of appropriations, not on any other. I think that's significant evidence that, you know, there is no temporal limitation set out in the Constitution. And there are, you know, many good reasons that Congress might choose to exercise its power of the purse in this way. It might reasonably determine that, you know, if it has to kind of reset the ledger for every federal agency and federal program every year, that's actually going to diminish its ability to oversee the executive, because it's going to have to spend all its time on that instead of, you know, overseeing through hearings, other fact-finding, how the executive is spending money, considering legislative changes to the system, you know, to the statutes as they exist. So there is really no basis in, we think, in 230 years of constitutional history for the idea of a time limitation. Certainly, no case holds that, that anyone, including the concurrence, has identified. You know, to the extent that the concurrence was sort of reading a CFPB-sized exception into the Appropriations Clause, there's absolutely no cause to do that. The clause is categorical, but I'd also point out that Justice Alito, in the Collins decision, specifically said courts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies, and that the removal clause question doesn't hinge on that inquiry. I think the exact same thing should apply in the Appropriations Clause context, where, again, you have a categorical command. And you know, I would also say I think we dispute or we disagree with the concurrence's accounts of the differences in authority between the Bureau and other agencies, like the Federal Reserve. You know, the prudential banking regulators have broad authority to issue rules, to conduct adjudications, to levy civil penalties. You know, in certain respects, the Bureau's statute is actually modeled on the prudential regulators' statutes. So even if the Court were to go down this road, and again, I think it's something that Justice Alito specifically rejected in Collins, there is no meaningful distinction to be drawn there. And I see my time is up. I'm happy to answer any other questions. Otherwise, we would ask the Court to affirm the judgment below in full. All right. Thank you very much, Counsel. Mr. Vergonis, I think you've reserved five minutes. Start off by answering, you know, the framers knew how to include a temporal limitation. We just think that history says a lot here and that the Court should be guided by that. And again, I would defer to Judge Jones's scholarly opinion on the Appropriations Clause. I wanted to correct something that my friend said. We don't concede that Collins's limitation on relief applies outside of its narrow circumstances there, which was disgorgement of funds. But we think the simplest way for the Court to decide this case is just to assume that Collins applies, because we so readily satisfy Collins. Collins said removal provisions alone don't cause harm, but one of the examples the Court gave was where the President expressed his desire to remove the official but couldn't do so because of the removal restriction. That's functionally what we have here. We have common sense from the fact that the new President of a different party, plus all the contemporaneous reporting and Cordray's own account, that President Trump wanted to remove Cordray but didn't do so because of this removal provision. So under Collins, that clearly, clearly causes harm. Ratification is evidence of what the President wanted to do. Well, one, that's not Collins's test. Collins's test is whether the President would have removed this officer. And two, we know from cases like Free Enterprise Fund, which was quoting George Washington, the impossibility that one man should be able to perform all the great business of the state, or from Myers v. United States, that officers represent the President in thousands acts to which it hardly can be supposed that his personal attention is called. In other words, the President doesn't know the details of the payment provisions, and we can't infer anything about what President Trump wanted or didn't want with respect to these provisions. The public is entitled to have an officer answerable to the President, decide those things, and do them through notice and comment rulemaking. And that didn't happen here once President Trump wanted to remove Cordray and was prevented from Congress's unconstitutional removal provision from doing so. Ratification can't save it because, one, the cost-benefit analysis quite clearly did play a role. And you can go back to the Federal Register, the language I quoted that said that it lessened the impacts was the beginning of the Court's cost-benefit analysis, and everything followed from that. And counsel's arguments about how the payment provisions could be justified under the Bureau's new standard, they're interesting arguments. They're post-hack rationalizations. The Bureau didn't make those arguments in 2020, and it was required at the time a contemporaneous explanation to explain why the removal provisions complied with the new standard. The Bureau didn't even acknowledge in the ratification that it adopted a new standard. So we ought to win on Collins. We ought to win on ratification. And even apart from that, the payment provisions, as enacted in 2017, violated the APA for several independent reasons set forth in our brief. And I did want to, I apologize for not getting to this in my opening argument, but I wanted to emphasize one arbitrary and capricious argument here, that the provisions are irrationally overbroad because they extend to two circumstances that the Bureau didn't study and that the Bureau admitted in 2017 don't generate the harms that the provisions are designed to address. One of those was extending the payment provisions not only to payments made over the ACH network, which governs bank-to-bank electronic transfers, but extending it to debit and prepaid cards in addition to ACH. Again, the Bureau didn't study debit and prepaid cards. It admitted that in 2017, and yet it extended it to them. It also admitted in 2017 that debit and prepaid cards generally do not charge consumers fees. And the key premise of the rule was that the rule was needed because each additional payment attempt by a lender is likely to trigger substantial additional fees. So generally not resulting in fees is the opposite of generally triggering fees. So it's quintessential arbitrary and capriciousness to extend the rule, the payments provisions, to payments made via debit and credit card. The Bureau also extended them to installment loans and to separate installments of installment loans. So the heartland of this rule is single-payment payday loans, where a consumer borrows the money and repays it 15 days or 30 days later. Installment loans are larger loans where payments are made periodically, like a mortgage loan or a car loan, and the Bureau didn't specifically study installment loans. So again, arbitrary and capricious for extending the payday rule to installment loans. And none of the Bureau's key premises apply to installment loans. As premise one, some lenders make multiple attempts to collect payments, the Bureau said, on the same day or within a short period of time. By definition, installment attempts are made weeks or months apart. Premise two, borrowers do not anticipate multiple attempts to collect the same payment. By definition, installment loans are different payments. The Bureau had no evidence that consumers don't anticipate that if you don't pay your lender to come after you for your June payment or your July payment or your August payment. Premise three, close-in-time attempts are unlikely to be successful. Installment loans are spread weeks or a month apart. They're likely to be successful, as the Bureau acknowledged. So my time has expired, so thank you, Your Honor. All right, counsel. Thank you both. The case is submitted. And as you exit, we'll welcome up our fourth and final witness.